256 N.J. Super. 295 (1992)
606 A.2d 1132
MANALAPAN BUILDERS ALLIANCE, INC., A NEW JERSEY NON-PROFIT CORPORATION, AND NEW JERSEY SHORE BUILDERS ASSOCIATION, A NEW JERSEY NON-PROFIT CORPORATION, PLAINTIFFS-RESPONDENTS,
v.
TOWNSHIP COMMITTEE OF THE TOWNSHIP OF MANALAPAN, AND TOWNSHIP OF MANALAPAN, IN THE COUNTY OF MONMOUTH, A MUNICIPAL CORPORATION OF NEW JERSEY, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued March 25, 1992.
Decided May 20, 1992.
*296 Before Judges KING, DREIER and GRUCCIO.
Robert F. Munoz argued the cause for appellants (LoMurro, Davison, Eastman & Munoz, attorneys; Robert F. Munoz, of counsel and on the brief).
Steven M. Berlin argued the cause for respondents (Giordano, Halleran & Ciesla, attorneys; Steven M. Berlin, of counsel; Guy P. Ryan, on the brief).
The opinion of the Court was delivered by KING, P.J.A.D.
The Township Committee and Township of Manalapan appeal from a judgment holding an Ordinance in the Land Use and Development Code of Manalapan Township (Code) invalid and ultra vires. This Ordinance excluded land with certain critical terrain features from lot and floor area calculations.
This case presents a novel issue on the appellate level, that is, whether a municipality may require the elimination of ecologically sensitive areas from lot and floor area calculations in order to preserve certain land features from development and promote environmental protection. We agree with the conclusion of the Law Division judge that adoption of the Ordinance here was ultra vires, and beyond the legislative power of Manalapan Township, because the municipality impermissibly altered certain statutory definitions in the Municipal Land Use Law, N.J.S.A. 40:55D-1 to -129, (MLUL). We affirm.

*297 I
Plaintiffs are trade associations composed of corporations, partnerships and individuals who are actively engaged in residential development and construction in Manalapan and own real property in the Township. The Township of Manalapan is geographically divided into northern and southern sections by a railroad line which runs east and west through the Township. The northern portion of the Township is largely developed in a "suburban fashion" with small residential lots. The southern portion is less developed and more rural with substantial tracts of vacant land. The southern portion of the Township must accommodate future development.
On May 10, 1989 the Township Committee introduced the Omnibus Ordinance, a package of amendments to the Township Code that included the specific Ordinance at issue here: Section I. The Township referred the Omnibus Ordinance to the Planning Board (Board) for a report and recommendations, pursuant to N.J.S.A. 40:55D-26.
The Board reviewed the Omnibus Ordinance at its meeting on May 25, 1989. The Board concluded that the proposed amendments were consistent with the Township's Master Plan and Land Use Plan and in part alleviated concerns about sensitive land features by excluding such areas from the calculation of lot areas and density requirements. The Board recommended the adoption of the Omnibus Ordinance without modification.
On June 14, 1989 the Township Committee adopted the Omnibus Ordinance. The portion of the Omnibus Ordinance in issue in this case states:
SECTION I
The establishment of appropriate population densities and concentrations that contribute to the well-being of persons and neighborhoods, and that preserve the environment, require that each lot be suitable for its intended use. Within the Township of Manalapan, the presence of flood hazard areas, wetlands, hydric soils, and steep slopes constrain the use of land due to the dangers of flooding, erosion, siltation, water quality degradation, and loss of natural habitat. This section amends the Township Development Regulations to exclude *298 from lot area calculations sensitive natural features whose disturbance by development affects the public health, safety and welfare.
These amendments are designed to advance the purposes of the Municipal Land Use Law and to coordinate municipal procedures shaping development with land use policies of the State of New Jersey pursuant to the State Planning Act and the Freshwater Wetlands Protection Act. [N.J.S.A. 13:9B-1 to -30].
Section 130-66, Exclusions from lot area calculations, Article XIII, Chapter 130, is hereby amended to read as follows:
130-66 Exclusions from lot area calculations.
A. The following features shall not be included within the area of a lot for the purpose of calculating lot area as required by each zone or for calculating permissible floor area based upon a floor area ratio standard:
(1) An existing or proposed right-of-way.
(2) Any portion of a lot classified as a floodway by the New Jersey Department of Environmental Protection or as an area of special flood hazard or floodway pursuant to Section 108-6, Definitions, Flood Drainage Control, of the Township Code.
(3) Wetlands and any required wetlands transition area pursuant to the New Jersey Freshwater Wetlands Protection Act (N.J.S.A. 13:9B-1 et seq.).
(4) Slope areas where the inclination of the land's surface from the horizontal is fifteen (15) percent or greater.
(5) One-half of the slope areas where the inclination of the land's surface from the horizontal is ten (10) percent or greater but less than fifteen (15) percent.
(6) Stream Corridors. Stream corridor means any river, stream, pond, or lake, including its floodway or permanent channel. The stream corridor shall also include any of the following features that lie within a specified distance from the stream as measured parallel to the top of the channel's banks: wooded areas, areas of special flood hazard, slopes of ten (10) percent or greater, wetlands, hydric soils, transition areas required pursuant to the New Jersey Freshwater Wetlands Protection Act. In areas served by public sewer, the specified distance shall be measured not more than fifty (50) feet from each bank. In areas not served by public sewer, the specified distance shall be measured not more than one hundred fifty (150) feet from each bank.
(7) Hydric soils identified on the list of New Jersey hydric soils in the publication Wetlands of New Jersey, National Wetlands Inventory, July 1985.
(8) Buffers when required on single-family tracts fronting on a collector or arterial street. Yard setbacks shall be measured from buffer strip limits.
Section I of the Omnibus Ordinance was ultimately codified at § 130-66 of the Township Code. It amended and replaced an Ordinance in which only two items were excluded from density and lot area calculations: 1) rights-of-way, which are typically excluded from density and floor area because they usually became municipal properties, and 2) floodways.
*299 At the bench trial, plaintiffs presented Carolyn B. Neighbor, a planning expert. She testified that Section I was contrary to the mandate of the MLUL because it changed the statutory definitions of density and floor area. She explained that density, i.e., the number of units per gross tract area for a particular piece of property, was generally ascertained by dividing the total tract area by the minimum lot size set forth in the township code, in order to determine a reasonable yield. This calculation would take into account some loss for roadways. Once density was known, other factors such as bulk standards were applied to the property in order to determine the number of lots a site would actually produce. She said that this method resulted in uniformity of density within each zoning district.
According to Neighbor, application of Section I would destroy this uniformity since the Ordinance alters the starting point used to determine density. That is, by first excluding certain areas from the gross includable area of the property, densities for similarly situated parcels of land in the same zoning district could be different and, consequently, the zoning district would lose its uniformity. The expert planner, Neighbor, described uniformity as the same density for a gross tract area from property to property regardless of whether or not cluster or other provisions were permitted by ordinance.
As to floor area, Neighbor testified that the effect of the Ordinance was to delete from the gross tract area land containing the defined critical factors in order to arrive at a net tract area prior to applying the floor area ratio criteria stated in the Township Code, rather than applying that criteria directly to the gross area as required by the MLUL. Thus, floor area ratio could vary from tract to tract within a zoning district because the uniform standard stated in the Township Code was applied to less than the gross area.
To illustrate her point, Neighbor used an example containing three tracts of equal size located in one zoning district where the floor area ratio standard was 10%. The first lot had no *300 critical features, so 100% of the lot could be covered with a building. The second lot had 20% of its area composed of critical features, so the floor area ratio would ultimately be reduced because the 10% standard could only be applied to 80% of the lot. The third lot had 50% of its area composed of critical features, so the floor area ratio would be reduced even more since the 10% standard could only be applied to 50% of the lot. Under the Ordinance, these determinations must be made before the application of any design criteria in the Township Code which would determine the floor area the site could actually yield.
In addition to claiming that Section I changed the MLUL's definitions of density and floor area, Neighbor testified that it did not achieve its anticipated purpose of environmental protection. While acknowledging the fact that because bulk standards remained the same, the effect of Section I would be lower densities (the Township's counsel stipulated to decreased density), Neighbor stated that there was no correlation between lowering density and protecting environmentally sensitive areas since Section I itself did not prohibit or restrict construction on the critical features listed in the Ordinance. Such goals could be achieved readily, however, by ordinances which reasonably limited construction upon or disturbance of these areas but otherwise allowed their inclusion in lot and floor area calculations. Indeed, such sensitive areas could be used for open space, transitional or buffer area requirements.
Plaintiffs also presented John J. Ploskonka, an engineering expert. He reinforced Neighbor's conclusion that Section I destroyed uniformity within the Township and actually altered density and floor area ratios. Ploskonka referred to his work on a 30-acre irregularly-shaped parcel in the Township, which contained wetlands, wetlands transition areas and slopes, totalling about 11 acres. Applying the minimum lot size requirement of 80,000 square feet (two acres) in the Ordinance, he found that the property could be designed into 12 lots. He *301 used the wetlands as part of the yard area, avoiding construction even though he had obtained a permit to fill them.
After applying Section I, however, the property would yield only five lots with an average size of six acres. In addition, since there was nothing in Section I that prevented actual construction in or on the defined critical areas, construction was proposed on the steep and moderate slopes found on two of the lots. Thus, Ploskonka opined and actually demonstrated that Section I operated only to reduce yield on a particular tract and not to protect the environment.
Ploskonka also described his work on a commercial parcel in south Manalapan. This parcel was about five acres, about 500-feet-deep and 500-feet-wide. The property had about three acres of wetlands and wetlands transition areas. Prior to the adoption of Section I, the floor area ratio of the property was.20 or 20% lot coverage, resulting in potential building space of 44,000 square feet. After applying Section I, the floor area ratio was reduced to .08 or 8% lot coverage, resulting in potential building space of 18,000 square feet.
Defendants presented Richard S. Cramer, a planning expert. Cramer had drafted the Omnibus Ordinance, including Section I, after he concluded that the Board wanted to exclude certain property features from lot-area calculations as a matter of policy even though they were not so designated in the Township Code. Since it was impractical to draw zoning districts based around only one or two particular critical features, Section I took a broad restrictive approach, excluding from lot-area calculations and any proposed buildings a variety of specifically-named features in order to locate such buildings and other improvements wholly outside those critical areas.
Cramer intentionally used the term "lot area" in Section I instead of "density," and agreed that, after applying the Ordinance, density was not based on the number of dwelling units per gross area. Instead, it was based on the number of dwelling units a lot could actually yield per tract area, less *302 critical features and after applying other design standards. He acknowledged the fact that the Ordinance did not deal with construction or the lack of it on the specified features and that it did not require development to occur in any particular portion of a resulting lot.
Cramer, however, stated that there were other provisions in the Omnibus Ordinance which restricted development in certain environmentally sensitive areas. He explained that pursuant to regulations dealing with subdivisions, an application submitted to the Board for development of a parcel be must accompanied by an environmental impact report and must identify the critical areas on the site. During the review process, the Board would recommend that, where possible, development be sited in areas away from the defined critical features and that the balance of the critical areas be included in a conservation easement, which would preclude any disturbance. Cramer acknowledged that environmental impact statements were required when local and regional aquifers were affected by proposed development and that such impact statements were not required for any of the features named in Section I.
Nevertheless, Cramer stated that these subdivision regulations allowed the Board to withhold its approval of lots or change configurations because of site conditions, including topography. In addition, there was a section of the Omnibus Ordinance which dealt with "natural features preservation" and called for preservation within a tract wherever possible. Lastly, already extant at the time of adoption of the Omnibus Ordinance were provisions "against development within the floodway and its deduction from [lot area] calculations." Flood hazard areas were not covered.
Cramer explained that Section I achieved its goal of protecting critical areas by effectively lowering densities and increasing lot sizes. The Omnibus Ordinance affected the southern section of Manalapan, where there were more critical areas, to a greater extent than the northern "suburban" section, increasing *303 individual lot sizes from 2.4 to seven acres per dwelling unit despite the two-acre lot-size minimum established in the Township Code. In addition, he claimed that applications for subdivisions pending before the Board showed a more responsible treatment of the land in terms of their sensitivity to critical areas. Cramer pointed to one application for approval of a proposed subdivision of a 21-acre parcel in an R-20 zone (single-family residential homes). Originally, the proposed parcel was divided into 19 individual lots. However, because there were wetlands and transition areas on the parcel, the applicant replatted the property taking into account the requirements of Section I. This resulted in only nine lots, each with at least 20,000 square feet and with proposed dwellings located totally outside the critically sensitive areas. Thus, there would be less disturbance of the sensitive areas because of the reduction in density.
Cramer also thought that the Ordinance implemented uniformity of planning in the Township. He explained that "similar sites will be treated in similar purposes for the density or intensity calculations." For example, referring to the pending application cited above, Cramer explained that uniformity was achieved because the parcel "is going to have a single-family development located on a parcel that is at least 20,000 square feet of upland area or more." Uniformity, according to him, required that parcels of land in the same district, proposed for the same use, with the same sensitive features, were to be treated the same, "in order to maintain uniformity." That is, "if there are two parcels in the same zone which have different environmentally sensitive features but they were to be used for the same purpose,... they would not be treated uniformly unless a calculation was made for the environmentally sensitive features."
Judge Peskoe ruled in favor of the plaintiffs and held the Ordinance invalid because it precluded the use of land for purposes permitted by the MLUL, nullified the uniformity of zoning regulations found elsewhere in the Township Code, and *304 was preempted by the Freshwater Wetlands Protection Act. We need reach only the first point to affirm.

II
The Township contends that the trial judge erred in finding Section I void on the ground that it altered the statutory definitions of density, residential density, floor area ratio and lot contained in the MLUL. Specifically, the judge found that the Ordinance, which resulted in net amounts being used for calculations of lot and floor areas, changed the statutory definitions of density, floor area ratio, lot and residential density, all of which rely on gross area or gross acreage of land. She concluded that under the Ordinance, a developer could be required to utilize a greater gross area for development than the zoning ordinances or MLUL otherwise required. By enacting Section I, she found that defendants acted beyond the powers granted by the MLUL.
The MLUL was adopted to simplify and standardize zoning and planning procedures throughout the State. Accardi v. Mayor & Council of N. Wildwood, 145 N.J. Super. 532, 546, 368 A.2d 416 (Law Div. 1976). Its primary purpose was to encourage municipalities to develop land-use strategies in a more efficient and standardized manner. Levin v. Parsippany-Troy Hills Tp., 82 N.J. 174, 179, 411 A.2d 704 (1980). The power to zone is contained within N.J.S.A. 40:55D-62. Although the power is broad, the municipality must use the power within the limits of the legislative delegation of the MLUL and the standards which accompany that authorization. Lakewood Residents Ass'n v. Congregation Zichron Schneur, 239 N.J. Super. 89, 93, 570 A.2d 1032 (Law Div. 1989). A zoning ordinance enjoys a presumption of validity, which may be overcome by a showing that the ordinance is "plainly contrary to fundamental principles of zoning or the [zoning] statute." Riggs v. Long Beach Tp., 109 N.J. 601, 611, 538 A.2d 808 (1988) *305 (quoting Bow & Arrow Manor, Inc. v. Town of West Orange, 63 N.J. 335, 343, 307 A.2d 563 (1973)).
The MLUL is explicit in its definitions. N.J.S.A. 40:55D-4 defines "density" as "the permitted number of dwelling units per gross area of land to be developed." Density restrictions affect only the number of individual residential units that may be constructed on a tract of land. Commercial Realty and Resources Corp. v. First Atlantic Properties Co., 122 N.J. 546, 561, 585 A.2d 928 (1991). N.J.S.A. 40:55D-4 defines "floor area ratio" as "the sum of the area of all floors of buildings or structures compared to the total area of the site." Floor-area restrictions affect the aggregate size, i.e., height, width and depth, of structures in relation to the area of the land on which they are to be built. Commercial Realty, supra, 122 N.J. at 561, 585 A.2d 928. N.J.S.A. 40:55D-4 also defines "lot" as "a designated parcel, tract or area of land established by a plat or otherwise, as permitted by law and to be used, developed or built upon as a unit." And, N.J.S.A. 40:55D-6 defines "residential density" as "the number of dwelling units per gross acre of residential land area including streets, easements and open space portions of a development."
The Omnibus Ordinance involved in this case, however, allows the calculation of lot and floor areas only after they are reduced by certain land features specified in the Ordinance. Consequently, as plaintiffs correctly note, the statutory definition of "floor area ratio" is changed to net area of the site and "lot" is changed to a net unit. When the Ordinance is applied to a particular parcel, the definitions of "density" and "residential density" are changed from gross area to net area. In our view, the trial judge was correct in finding Section I void as ultra vires and beyond the local legislative power.
The Township admits that Section I does change certain statutory definitions. It contends that, pursuant to N.J.S.A. 40:55D-65b, it was entitled to adopt and enact other formulas to accomplish the purposes and goals set forth in its ordinances, *306 and that Section I falls within the definition of these other formulas and ratios since it was adopted to control development on environmentally sensitive lands. The Township claims that there is no individual flexibility to zone if it must narrowly follow the definitions as set out in the MLUL. We disagree.
N.J.S.A. 40:55D-65b permits a zoning ordinance to:
Regulate the bulk, height, number of stories, orientation, and size of buildings and the other structures; the percentage of lot or development area that may be occupied by structures; lot sizes and dimensions; and for these purposes may specify floor area ratios and other ratios and regulatory techniques governing the intensity of land use and the provision of adequate light and air, including, but not limited to the potential for utilization of renewable energy sources.
Nowhere, however, does the MLUL allow municipalities to change the definitions of terms in the statute in order to control development or promote environmental protection. N.J.S.A. 40:55D-3 declares that the prescribed definitions are to be used for purposes of the MLUL, "unless the context [used in the Act] clearly indicates a different meaning." Moreover, N.J.S.A. 40:55D-2d declares that one of the purposes of the MLUL is "[t]o ensure that the development of individual municipalities does not conflict with the development and general welfare of neighboring municipalities, the county and the State as a whole." Also, N.J.S.A. 40:55D-2m states that another purpose of the MLUL is "[t]o encourage coordination of the various public and private procedures and activities shaping land development with a view ... to the more efficient use of land."
As plaintiffs suggest there are several cases, although not of definitive precedential value, that provide guidance. In Crow-New Jersey 32 Ltd. Partnership v. Clinton Tp., 718 F. Supp. 378 (D.N.J. 1989), a federal district court judge considered the validity of a section of a Clinton zoning ordinance which had been invalidated as inconsistent with the MLUL by a Superior Court, Law Division judge in an earlier decision. See R. 1:36-3 (ineffability of unpublished opinions.) The pertinent section required calculation of permissible floor area ratios only after *307 the size of the lot was reduced to eliminate those portions of the land which contained certain environmental constraints ("critical areas"), such as bodies of water, flood areas, wetlands and certain slopes. The federal judge agreed with the Law Division judge and invalidated the Clinton ordinance, finding that it illegally changed the definition of floor area ratio. The federal judge said:
The Land Use Law enables the Township of Clinton to adopt "floor area ratios and other ratios and regulatory techniques governing the intensity of land use..." N.J.S.A. 40:55D-65(b). "Floor area ratio" is defined as "the sum of the area of all floors of buildings or structures compared to the total area of the site." N.J.S.A. 40:55D-4 (emphasis added). In contrast, Ordinance # 386-88 calculates the floor area ratio by comparing floor area with the total area of the site minus the "critical areas". By defining "floor area ratio" in the ordinance differently than it is defined in the enabling statute, the township has clearly gone beyond its statutory grant of power. This court must be guided by, and totally agrees with, the decision of Judge Bernhard of the Superior Court of New Jersey on this precise issue. Judge Bernhard decided, as this court does, that Section 2 of Ordinance # 386-88 is null and void. [718 F. Supp. at 388.]
Similarly, Kaplan v. City of Linwood, 252 N.J. Super. 538, 600 A.2d 180 (Law Div. 1991), was a suit by a property owner who sought to subdivide a lot, containing his residence, into two separate lots for construction of a new home. The proposed new lot was partially in a conservation zone which prohibited buildings and structures, and partially in a standard residential zone. The planning board denied the owner's application for a minor subdivision, concluding that the measurements for lot size, setbacks and other bulk requirements must be calculated by using only that portion of the lot situated in the residential zone. The property owner appealed to the Law Division contending that the measurements should have been from lot line to lot line and prevailed.
The Law Division judge ruled that the board's decision was unsound, stating:
Reading the ordinance to allow the area located within the conservation zone to be used for bulk requirements is consistent with the purposes for having bulk requirements, which include preservation of light, air, open space and density. The proposed new lot is over 73,000 square feet. The use of open *308 space that is designated as wetlands, located in the conservation zone, furthers these goals. Although plaintiff could not build a structure on the portion of the property located in the conservation zone, there is no reason why the balance of the property located in that zone should not be used for other than construction purposes. [Id. at 543, 600 A.2d 180].
Any other construction would have "render[ed] the definitional sections of the ordinance meaningless." Id. The judge in Kaplan relied in part on American Dredging Co. v. State, 169 N.J. Super. 18, 20-21, 404 A.2d 42 (App.Div. 1979), where we ruled that "even if the wetlands portion could serve no other practical purpose  which the record does not demonstrate  it could serve as the open area segment of the remainder of plaintiff's property when the latter is developed for industrial use."
In a different context, in Stoker v. Irvington, 71 N.J. Super. 370, 177 A.2d 61 (Law Div. 1961), Judge Labrecque invalidated that part of an ordinance which did not correspond to the statutory definition of "subdivision" found in the Municipal Planning Act of 1953, N.J.S.A. 40:55-1.1 to 1.21 (repealed). Id. at 379, 177 A.2d 61. In so doing, he found that the town was without power, in acting pursuant to statutory authority, to adopt its own definition of a subdivision by adding to the statutory exceptions. Id. at 378, 177 A.2d 61. "Municipalities taking advantage of the powers granted by the statute are bound by the legislative definition." Ibid.
We conclude that Section I of the Omnibus Ordinance improperly deviated from the definitions in the MLUL. We affirm for that reason alone and need not consider the balance of the trial judge's alternative grounds for decision or the Township's other points on appeal.
Affirmed.